NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

_____

6th Circuit Court-Franklin Family Division
No. 2021-0560

IN RE D.J.

Argued: September 20, 2022
Opinion Issued: July 13, 2023

Christopher M. Johnson, chief appellate defender, of Concord, on the brief and orally, for the juvenile.

John M. Formella, attorney general, and Anthony Galdieri, solicitor general (Laura E. B. Lombardi, senior assistant attorney general, on the brief and orally), for the State.

BASSETT, J. The juvenile, D.J., appeals a finding of delinquency made by the Circuit Court (Luneau, J.) based upon a petition alleging that he committed harassment under RSA 644:4, I(b) (Supp. 2021). He argues that there was insufficient evidence to support the trial court's finding, and that RSA 644:4, I(b) is unconstitutional as applied and on its face. See N.H. CONST. pt. I, art. 22; U.S. CONST. amend. I. We affirm.

The following facts were found by the trial court or are undisputed. On July 11, 2021, the victim was walking on a narrow sidewalk in downtown Tilton. Several juveniles, including D.J., were riding bicycles on the sidewalk.

The victim told the juveniles that they were not supposed to be riding bicycles on the sidewalk. D.J. told the victim to go "f**k himself." D.J. continued to yell at the victim, who testified that D.J. was "swearing, saying f**k this and f**k that and you're nothing but an old man." The victim yelled back at D.J. and asserted that he could do martial arts. D.J. got off his bicycle, provoked the victim to fight, and took off his shirt.

The owner of a store across the street from this encounter observed the confrontation and, after it had gone on for approximately five minutes, she began to record it using her cellphone. The store owner also called the police. The incident lasted approximately eight minutes, until a patrol officer arrived at the scene.

The State filed a delinquency petition in the circuit court alleging that D.J. committed the offense of harassment under RSA 644:4, I(b). Following an adjudicatory hearing, the trial court entered an order finding D.J. delinquent. The trial court subsequently held a dispositional hearing, after which the court placed him on twelve months' conditional release. This appeal followed.

Following briefing and oral argument, we remanded the case to the trial court so that it could expand upon its findings of fact and rulings of law. After receipt of the trial court's order, we invited the parties to file supplemental briefs, and both parties did so.

We turn first to D.J.'s statutory argument. See Chapman v. Douglas, 146 N.H. 209, 211 (2001) (noting our "established policy against reaching a constitutional issue in a case that can be decided on a non-constitutional ground"). The State's delinquency petition alleged that D.J. committed the offense of harassment, as defined in RSA 644:4, I:

> I. A person is guilty of a misdemeanor, and subject to prosecution in the jurisdiction where the communication originated or was received, if such person:
>
> > (a) Makes a telephone call, whether or not a conversation ensues, with no legitimate communicative purpose or without disclosing his or her identity and with a purpose to annoy, abuse, threaten, or alarm another; or
> >
> > (b) Makes repeated communications at extremely inconvenient hours or in offensively coarse language with a purpose to annoy or alarm another; or
> >
> > (c) Insults, taunts, or challenges another in a manner likely to provoke a violent or disorderly response; or
> >
> > (d) Knowingly communicates any matter of a character tending to incite murder, assault, or arson; or

2

> (e) With the purpose to annoy or alarm another, communicates any matter containing any threat to kidnap any person or to commit a violation of RSA 633:4; or a threat to the life or safety of another.

RSA 644:4, I (Supp. 2021) (emphasis added).  D.J. was charged only under subsection (b).  He does not dispute that he used "offensively coarse language with a purpose to annoy or alarm" the victim.  RSA 644:4, I(b).  He argues only that the State introduced insufficient evidence to prove that he made "repeated communications" within the meaning of subsection (b).  Id.  The State counters that D.J.'s conduct falls under the definition of "repeated communications" that we articulated in In re Alex C., 161 N.H. 231 (2010).  We agree with the State.

To prevail on a sufficiency of the evidence argument, D.J. must show that no rational trier of fact, viewing the evidence in the light most favorable to the State, could have found him to be delinquent beyond a reasonable doubt.  In re Juvenile 2003-187, 151 N.H. 14, 15 (2004).  Resolution of this case requires that we consider the meaning of "repeated communications" under RSA 644:4.  This is an issue of statutory interpretation, which we review de novo.  Id. at 16.  We interpret the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include.  Petition of Carrier, 165 N.H. 719, 721 (2013).  We construe provisions of the Criminal Code according to the fair import of their terms and to promote justice.  Juvenile 2003-187, 151 N.H. at 16.

RSA 644:4 defines "communicates," in relevant part, as "impart[ing] a message by any method of transmission."  RSA 644:4, II (2016).  It does not define "repeated."  In Alex C., we addressed whether the juvenile's instant messages constituted "repeated communications" within the meaning of RSA 644:4, I(b).  Alex C., 161 N.H. at 235.  In that case, the juvenile sent the victim two instant messages and then, following a forty-six minute break, sent seventeen more messages in a span of thirty-seven seconds.  Id. at 233-34.  Following another pause of less than a minute, the juvenile sent an additional twenty-two messages over a four-minute span.  Id. at 234.  We affirmed the trial court's finding of delinquency, stating that "repeated communications" means "renewed, frequent, or constant imparting of a message by any method of transmission," and found that the juvenile's conduct "fit squarely" within that definition.  Id. at 237.  In the instant case, the trial court found that, over the course of the eight-minute encounter, D.J. imparted "a series of messages, both verbal and non-verbal."  We agree with the State that this conduct constitutes "repeated communications" as defined in Alex C.

D.J. argues that this conclusion is contrary to the plain meaning of "repeated."  "Repeated" means "renewed or recurring again and again : CONSTANT, FREQUENT" or "said, done, or presented again."  Webster's Third

3

New International Dictionary 1924 (unabridged ed. 2002). Relying on these definitions, D.J. argues that the statute prohibits only acts of "successive communications," and "does not concern itself with each statement made during a single communicative interaction." We disagree. Nothing in the definitions cited by D.J. suggests that the same message may not be renewed or may not recur during a single interaction — particularly where, as here, the interaction continued for eight minutes.

D.J. asserts that <u>Alex C.</u> stands for the proposition that, unlike an online exchange of instant messages, "a single in-person interaction" cannot contain "repeated communications." However, we explicitly rejected in <u>Alex C.</u> the argument that a single conversation cannot contain repeated communications. <u>Alex C.</u>, 161 N.H. at 238 ("We disagree that a single conversation necessarily equates to a single communication."). At most, <u>Alex C.</u> highlights the reasons why an online exchange may be more likely than a verbal conversation to contain "repeated communications": the process of drafting and sending written communications creates breaks in communication because an individual sending instant messages must "compose[], physically type[] on a computer keyboard, [and] electronically sen[d]" each successive message. <u>Id.</u> at 238. Nevertheless, if messages exchanged in a verbal conversation are sufficiently discrete, they, too, may be "repeated communications." We conclude that when an individual makes a verbal remark, rejects an opportunity to stop communicating with the recipient, and imparts another message, a break has occurred sufficient to make the communications "repeated." Here, as the trial court observed, although D.J. had the opportunity to leave the scene after insulting the victim, "he chose to continue to remain, and engage [the victim] further."

Because we find the statutory language clear and unambiguous, we need not address D.J.'s argument regarding the rule of lenity. Viewing the evidence in the light most favorable to the State, we conclude that the trial court did not err when it determined that D.J. made "repeated communications" as set forth in RSA 644:4, I(b). <u>Juvenile 2003-187</u>, 151 N.H. at 15.

We now turn to D.J.'s constitutional arguments. He argues that RSA 644:4, I(b) criminalizes expressive conduct protected under Part I, Article 22 of the New Hampshire Constitution and the First Amendment to the United States Constitution. Part I, Article 22 provides: "Free speech and liberty of the press are essential to the security of freedom in a state: They ought, therefore, to be inviolably preserved." N.H. CONST. pt. I, art. 22. Similarly, the First Amendment prevents the passage of laws "abridging the freedom of speech." U.S. CONST. amend. I. We first address D.J.'s claims under the State Constitution, and rely on federal law only to aid in our analysis. <u>See</u> <u>State v. Bailey</u>, 166 N.H. 537, 540 (2014). In reviewing a legislative act, we presume it to be constitutional and will not declare it invalid except upon inescapable grounds. <u>State v. Gubitosi</u>, 157 N.H. 720, 727 (2008). In other words, we will

4

not hold a statute to be unconstitutional unless a clear and substantial conflict exists between it and the constitution.  Id. (quotation omitted).

D.J. makes two constitutional arguments: he contends that the statute is unconstitutionally overbroad on its face, and that it is unconstitutional as applied to the charged conduct.  We have explained our overbreadth law as follows:

> The purpose of the overbreadth doctrine is to protect those persons who, although their speech or conduct is constitutionally protected, may well refrain from exercising their rights for fear of criminal sanctions by a statute susceptible of application to protected expression.  While the Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere, the application of the overbreadth doctrine is strong medicine to be employed only as a last resort.  Thus, it remains a matter of no little difficulty to determine when a law may properly be held void on its face and when such summary action is inappropriate.

> If a statute is found to be substantially overbroad, the statute must be invalidated unless the court can supply a limiting construction or partial invalidation that narrows the scope of the statute to constitutionally acceptable applications.  If, on the other hand, a statute is not substantially overbroad, then whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied.

Gubitosi, 157 N.H. at 726-27 (citations and ellipses omitted).

We first consider D.J.'s argument that the statute is substantially overbroad and, therefore, invalid on its face.  A statute is substantially overbroad if the impermissible applications of the law are substantial when judged in relation to the statute's plainly legitimate sweep.  State v. MacElman, 154 N.H. 304, 310 (2006).  We have held that two subsections of RSA 644:4, I, are unconstitutionally overbroad.  See State v. Brobst, 151 N.H. 420 (2004) (subsection (a)); State v. Pierce, 152 N.H. 790 (2005) (subsection (f) (repealed 2016, see Laws 2016, ch. 136)).  However, in State v. Gubitosi, we rejected a facial challenge to the constitutionality of the subsection at issue in this case, subsection (b).  In Gubitosi, the defendant was prosecuted under subsection (b) when he made a series of threatening phone calls to the victim.  Gubitosi, 157 N.H. at 722-23.  We reasoned:

> RSA 644:4, I(b) is distinguishable from the subsections found unconstitutional in Brobst and Pierce.  RSA 644:4, I(b)

requires repeated communications that either occur at extremely inconvenient hours or contain offensively coarse language. Thus, unlike RSA 644:4, I(a) and (f), RSA 644:4, I(b) does not apply to "any call made to anyone, anywhere, at any time, whether or not conversation ensues." [Brobst, 151 N.H. at 424.] Under subsection (b), it is not just one call that constitutes the offense, but a repeated course of calls. Further, subsection (b) specifically requires communications that consist of "offensively coarse language" or "extremely inconvenient hours." Thus, unlike in Brobst, the offense is not complete when the call is made "to anyone, anywhere, at any time." Id. In addition, RSA 644:4, I(b) requires that these repeated communications be made with the purpose to annoy or alarm another. With these restrictions, the scope of RSA 644:4, I(b) is narrowly tailored to the illegal communications sought to be prevented.

Gubitosi, 157 N.H. at 728. The State argues that Gubitosi controls the instant matter and, therefore, we must hold that RSA 644:4, I(b) is not unconstitutionally overbroad. D.J. contends that Gubitosi does not control because the speech at issue in Gubitosi was made in private and, therefore, the court did not consider "the application of the statute to speech in public places." (Emphasis added.) To that end, D.J. argues that the statute's criminalization of speech made in public places renders it unconstitutionally overbroad. We agree with the State.

We reject D.J.'s assertion that, in Gubitosi, we "had no occasion to consider" the application of RSA 644:4, I(b) to public speech. In that case, we analyzed the limitations present within subsection (b) in order to determine that, "[w]ith these restrictions," the statute's scope was "narrowly tailored to the illegal communications sought to be prevented." Id. at 728. D.J. identifies no change of circumstances that renders Gubitosi inapplicable; indeed, D.J.'s argument relies primarily on out-of-state case law that predates Gubitosi. See People v. Smith, 862 P.2d 939 (Colo. 1993). Finding Gubitosi controlling, and in the absence of any argument from D.J. that we should overrule it, we conclude that the statute is not substantially overbroad on its face.

We must next determine whether the statute is overbroad as applied to the facts of this case — in other words, whether application of the statute to D.J.'s conduct infringes upon protected speech. See State v. Theriault, 157 N.H. 215, 219 (2008). D.J. argues that RSA 644:4, I(b) infringes on his protected speech because his conduct occurred "in public and not at extremely inconvenient hours," and that the statute criminalizes his speech "on the basis only of the use of offensively coarse language and a purpose to annoy [or] alarm." The State counters that, notwithstanding that D.J.'s conduct took place in public during the day, it is not constitutionally protected.

6

The right of free speech under Part I, Article 22 is not absolute and may be subject to reasonable time, place, and manner regulations that are content-neutral, narrowly serve a significant governmental interest, and allow other opportunities for expression. State v. Comley, 130 N.H. 688, 691 (1988). Here, we conclude that RSA 644:4, I(b), as applied to D.J.'s conduct, meets these requirements.

First, RSA 644:4, I(b) is content-neutral. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." State v. Lilley, 171 N.H. 766, 781 (2019). RSA 644:4, I(b) does not regulate D.J.'s expression based upon the message, ideas, subject matter, or content of that expression. See Opinion of the Justices, 128 N.H. 46, 50 (1986) (describing permissible content-neutral regulations of expression). Rather, the statute regulates the manner in which he communicated: repeatedly using offensively coarse language with the purpose to annoy or alarm the victim. See Lilley, 171 N.H. at 782 (holding ordinance content-neutral, in part because it "merely regulates the manner in which activities may be carried out").

Second, the application of RSA 644:4, I(b) to D.J.'s conduct narrowly serves a significant government interest. In Brobst, we considered RSA 644:4, I's constitutionality as applied to phone calls, and observed that "the State has a legitimate interest in protecting citizens from the effects of certain types of annoying or alarming" communication, such as the terror caused by receipt of a frightening phone call. Brobst, 151 N.H. at 424. We believe the State also has an interest in protecting citizens from equally annoying, alarming, frightening, and intrusive in-person communications. Here, the trial court found that, for eight minutes, D.J. repeatedly "us[ed] expletives and yell[ed]" at the victim, "provok[ing] [the victim] to fight." D.J. engaged in this behavior "with a purpose to annoy or alarm [the victim], and it did." We conclude that the statute narrowly serves the government's interest in protecting its citizens from such bullying.

Finally, the statute allows other opportunities for expression. The statute only criminalizes communication that meets three restrictive criteria: it must be repeated, offensively coarse or at inconvenient hours, and with the purpose to annoy or alarm. See RSA 644:4, I(b); cf. Gubitosi, 157 N.H. at 728 (concluding that RSA 644:4, I(b)'s requirements that communications be repeated and with the purpose to annoy or alarm another sufficiently limit the statute's application). Here, D.J. could have expressed his displeasure with the victim in a manner that would not have run afoul of the statute; for instance, he could have rebuked the victim without the use of "offensively coarse language" or without communicating repeatedly. We conclude that D.J. had available sufficient alternative means to communicate his message. Bailey, 166 N.H. at 546-47 (holding a park curfew ordinance constitutional as applied to individuals seeking to protest in the park overnight because the protesters

7

could "communicate their message in the manner that they wished" at other times of day, even if such protest "may have been less effective").

For these reasons, we conclude that RSA 644:4, I(b) is not unconstitutional under Part I, Article 22 as applied to D.J.'s conduct. Because the Federal Constitution offers D.J. no greater protection than the State Constitution in these circumstances, we reach the same conclusion under a federal analysis. State v. Bondolillo, 164 N.H. 370, 376 (2012). We therefore hold that RSA 644:4, I(b) is not unconstitutionally overbroad, either on its face or as applied to D.J.'s conduct, under the New Hampshire Constitution or the United States Constitution.

Affirmed.

MACDONALD, C.J., and HICKS, HANTZ MARCONI, and DONOVAN, JJ., concurred.